1  Bradford J. Black (SBN 252031)
   BRADFORD BLACK P.C.
2  1 Embarcadero Center, Suite 1200
   San Francisco, CA 94111
3  Telephone: (415) 813-6211
   Facsimile:  (415) 813-6222
4  Email: bblack@bradfordblack.com

5  *Attorneys for Plaintiff*
   ADAPTIVE CLASSIFICATION TECHNOLOGIES LLC
6

7                    **UNITED STATES DISTRICT COURT**

8                    **NORTHERN DISTRICT OF CALIFORNIA**

9

10 | ADAPTIVE CLASSIFICATION | Case No. 25-cv-09640 |
   | TECHNOLOGIES LLC, | |
11 | | **ORIGINAL COMPLAINT FOR** |
   | Plaintiff, | **PATENT INFRINGEMENT** |
12 | | |
   | v. | **DEMAND FOR JURY TRIAL** |
13 | | |
   | ARCTERA US LLC, | |
14 | | |
   | Defendant. | |
15

Plaintiff Adaptive Classification Technologies LLC ("Adaptive" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent No. 10,445,374 ("the '374 Patent" or "the patent-in-suit"). Defendant Arctera US LLC ("Arctera" or "Defendant") infringes the patent-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 271 *et seq.*, and Adaptive seeks compensation for this infringement.

## THE PARTIES

1. Plaintiff Adaptive Classification Technologies LLC is a Texas limited liability company with its principal place of business at 121 Frederick St., Austin, Texas 78704.

2. Upon information and belief, Defendant Arctera US LLC is a Delaware limited liability company with its principal place of business at 6200 Stoneridge Mall Road, Suite 150, Pleasanton, California 94588. Upon information and belief, Arctera conducts business in California and in this District and elsewhere in the United States, including by making, using, testing, offering for sale, importing into, and/or selling the Arctera eDiscovery software.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq.*

4. This Court has personal jurisdiction over Defendant for at least the following reasons: (a) Defendant is located in this District; (b) Defendant has committed acts of patent infringement and/or contributed to or induced acts of patent infringement in this District and continues to do so; (c) Defendant has purposefully established substantial, systematic, and continuous contacts with this District and should reasonably expect to be subject to this Court's jurisdiction; and (d) Defendant regularly does or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in this District and in California.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(d) and

1400(b) in that Defendant has a regular and established place of business in this District, a substantial part of the events giving rise to the claim occurred in this District, and Defendant has committed acts of infringement in this District.

### DIVISIONAL ASSIGNMENT

6. Pursuant to Civil L.R. 3-2(c) and General Order No. 44, this case is assigned on a district-wide basis.

### THE INVENTORS

7. The inventors of the '374 patent are Dr. Gordon V. Cormack and Dr. Maura R. Grossman. Each played a pivotal role in the creation and reduction to practice of the patented technology claimed in the '374 patent.

8. Dr. Gordon V. Cormack earned his B.Sc., M.Sc., and Ph.D. in computer science from the University of Manitoba in 1977, 1978, and 1981, respectively. After graduating, Dr. Cormack taught at McGill University before joining the University of Waterloo in 1983. These educational experiences provided the scholarly foundation for his pioneering work in compression, search, and e-discovery.

9. Over a four-decade career, Dr. Cormack has published more than 100 peer-reviewed papers and co-authored the graduate textbook Information Retrieval: Implementing and Evaluating Search Engines (MIT Press, 2010). Among his most acclaimed papers is his 2008 paper titled "Novelty and Diversity in Information Retrieval Evaluation," which received the 2019 ACM SIGIR (Special Interest Group on Information Retrieval) Test-of-Time Award.

10. Dr. Cormack has shaped benchmark-setting initiatives as a long-time program-committee member of NIST's Text Retrieval Conference, coordinating the Spam (2005–07), Legal (2010–11), and Total Recall (2015–16) tracks, and he served as president of the Conference on Email and Anti-Spam.

11. In addition to advancing the research field and the state of the art, Dr. Cormack also helped guide the next generation of innovators. For over a decade, Dr. Cormack coached the University of Waterloo's ACM International Collegiate Programming Contest teams, guiding them

to the World Finals every year of his tenure and helping them capture the World Championship in 1999 (along with North American titles in 1998 and 2000).

12. Dr. Cormack is the co-inventor of both Dynamic Markov Compression (DMC) and Continuous Active Learning® (CAL®). His and Dr. Grossman's research on technology-assisted review has been cited by courts in the United States, Ireland, and the United Kingdom when approving predictive-coding workflows.

13. Dr. Cormack is currently professor emeritus at the David R. Cheriton School of Computer Science at the University of Waterloo and continues to actively consult in the fields of machine learning and AI-assisted review.

14. Dr. Maura R. Grossman, Dr. Cormack's peer and co-inventor, is a research professor at the University of Waterloo's Cheriton School of Computer Science, cross-appointed to the School of Public Health Sciences, and the principal of her own consulting business. She also holds an adjunct post at Osgoode Hall Law School and has taught e-discovery at Columbia and Georgetown.

15. Dr. Grossman earned an A.B., magna cum laude, from Brown University, followed by her M.A. and Ph.D. in Psychology from the Gordon F. Derner Institute of Advanced Psychological Studies at Adelphi University. She later obtained her J.D., magna cum laude and Order of the Coif, from Georgetown University Law Center, where she served as Executive Notes & Comments Editor of the Georgetown Law Journal. These multidisciplinary credentials—combined with her research professorship in computer science—laid the foundation for her pioneering contributions to technology-assisted review and electronic discovery.

16. For seventeen years, Dr. Grossman was Of Counsel at Wachtell, Lipton, Rosen & Katz, where she led e-discovery and information-governance strategy for Fortune 100 clients.

17. Dr. Grossman's landmark 2011 article "Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient than Exhaustive Manual Review," co-authored with Dr. Cormack, is a canonical guide for technology-assisted review, providing empirical proof that predictive coding can outperform manual review. It is now a staple citation in judicial opinions worldwide.

18. Courts frequently appoint Dr. Grossman as a special master or discovery expert—most notably in the Southern District of New York—to design and monitor TAR protocols, and she co-led NIST's TREC Legal (2010–11) and Total Recall (2015–16) tracks, setting industry benchmarks.

19. Like Dr. Cormack, Dr. Grossman also played a pivotal role in guiding the next generation of innovators. In 2019, she was named Director of Women in Computer Science at Waterloo, and she taught the interdisciplinary course "Artificial Intelligence: Law, Ethics, and Policy."

20. Dr. Grossman has received numerous awards for her scholarship and contributions to the field, including the American Bar Association's 2016 "Legal Rebel" designation, inclusion in the 2017 Fastcase 50 list of legal innovators, and recognition by Who's Who Legal (2020) as a National and Global e-Discovery Leader.

21. In addition to the above accolades, Dr. Cormack and Dr. Grossman are named inventors on almost a dozen patents (the "Cormack/Grossman patents") in the fields of machine learning, technology-assisted document review, and active document processing.

22. These patents have been cited in hundreds of U.S. patents and published patent applications as prior art before the United States Patent and Trademark Office. Companies whose patents cite the Cormack/Grossman patents include:
- Microsoft Corporation
- Open Text Corporation
- International Business Machines Corporation
- Nuix North America
- Canon Inc.
- Ford Motor Company
- Oracle Corporation
- SAP SE
- AT&T Inc.
- Fujitsu Limited
- Xerox Corporation
- Kyocera Corporation
- Nokia Corporation
- Relativity ODA LLC
- Bank of America Corporation

## TECHNOLOGY BACKGROUND

23. Electronic discovery ("e-discovery") traces its roots to early efforts to process computer-generated evidence in the 1960s. The modern era began when full-text retrieval systems—such as Concordance—debuted in mid-1980s, allowing lawyers to keyword-search digital pages rather than flip through boxes of paper records.

24. Early milestones include the 1970 amendment to Federal Rule 34 authorizing discovery of "electronic data compilations," and the creation of the Electronic Discovery Reference Model (EDRM) in 2005, which described the now-familiar stages of preservation, processing, review, and production.

25. By the late 1990s, everyday email use and network backups had multiplied data volumes, setting the stage for Judge Shira Scheindlin's *Zubulake* rulings (2003–2005). *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004). Those decisions underscored that litigants must preserve and produce relevant digital documents, including email, even when they reside on difficult-to-restore backup tapes—highlighting the need for software that could search, de-duplicate, and review massive collections defensibly.

26. The 2006 amendments to the Federal Rules of Civil Procedure expressly addressed e-discovery, defining "electronically stored information" ("ESI") in Rules 16, 26, 33, 34, 37, and 45 and introducing Rule 26(b)(2)(B), which excuses production of ESI that is "not reasonably accessible because of undue burden or cost." Those amendments helped drive demand for review platforms—such as Concordance, Summation, IPRO, and early versions of Relativity—that converted native files to TIFF images, paired them with load files, and drove attorney review through static keyword hit lists.

27. While those systems were sufficient for their time, they were quickly overwhelmed by the volume of data expected to be processed and reviewed.

28. From the mid-1980s to the early 2000s, the cost to store data fell by orders of magnitude, and corporate data volumes increased commensurately—making purely linear keyword review untenable or, at best, unreasonably expensive for many matters.

29.     Vendors introduced concept-clustering, near-duplicate detection, and email threading. Yet reviewers still had to craft broad search strings and perform manual quality control, leaving many responsive documents undiscovered and review costs spiraling. These pressures led to experimentation with machine-learning techniques to classify documents more efficiently—the seeds of technology-assisted review ("TAR").

30.     In 2011, Dr. Maura R. Grossman and Dr. Gordon V. Cormack published research demonstrating that supervised learning could achieve higher recall than exhaustive manual review at a fraction of the effort. Within a year, Magistrate Judge Andrew Peck cited that research in *Da Silva Moore v. Publicis Groupe*—an early federal opinion approving "predictive coding." See 287 F.R.D. 182 (S.D.N.Y. 2012).

31.     Early "TAR 1.0" implementations commonly used sizeable seed sets, staged training rounds, and often employed curated control samples to measure recall. In such workflows, a model would be trained on an initial set of documents, then applied to remaining documents in the collection; models were typically updated only after additional rounds of training.

32.     Commentators later contrasted TAR 1.0 with TAR 2.0 methods that provided more flexible, continuous learning.

33.     In 2014–2015, Drs. Cormack and Grossman introduced Continuous Active Learning® (CAL®)—a protocol that retrains as coding progresses and dynamically re-ranks the corpus. Peer-reviewed evaluations beginning with the SIGIR study—and extended in follow-up work—reported efficient, high-recall results using continuous learning.[1]

34.     CAL®'s reported effectiveness spurred rapid commercial adoption. Major platforms introduced continuous-learning capabilities, and cloud-based tools highlighted speed and machine-learning-driven culling as key advantages.

35.     In 2019, industry bodies such as EDRM published TAR guidelines recognizing continuous-learning approaches, including CAL®, as widely accepted for high-recall workflows.

---

[1] CAL® is often referred to as TAR 2.0.

36. Today, TAR platforms often layer continuous learning with concept analytics, communication mapping, and (increasingly) summarization tools, enabling counsel to interrogate large digital repositories efficiently.

37. Arctera and its predecessor entities have built and maintained a portfolio of e-discovery patents, reflecting their view that innovations in document review, evaluation, and analytics warrant patent protection. By way of example, U.S. Patent No. 9,600,568 ("Methods and systems for automatic evaluation of electronic discovery review and productions") and U.S. Patent No. 10,083,176 ("Methods and systems to efficiently find similar and near-duplicate emails and files") are presently assigned to Arctera US LLC.

## OVERVIEW OF U.S. PATENT NO. 10,445,374

38. U.S. Patent No. 10,445,374, entitled "Systems and Methods for Conducting and Terminating a Technology-Assisted Review," was filed on June 17, 2016 and claims priority to June 19, 2015. The '374 Patent is valid and enforceable. A true and correct copy of the '374 Patent is attached hereto as Exhibit A.

39. The '374 Patent discloses systems and methods for determining when to terminate a classification process such that classifiers generated during iterations of the classification process accurately classify documents in a collection (e.g., as relevant or non-relevant) and achieve high quality "within a certain level of assurance," i.e., high reliability. Ex. A, 4:8–17.

40. The '374 Patent addresses modern ESI scale by beginning with a reviewer-identified target set (T). As the specification explains:

> "In step **1020**, relevant documents are identified in a document collection to create a target set T. Following or during identification of the target set T, an indication of the documents in the target set T may be received. In certain embodiments, documents in T are identified by selecting documents at random from the document collection, presenting the document to one or more reviewers, and then adding the document to the set T if the reviewer indicates the document is 'relevant.'"

Ex. A, 6:63-7:14.

41. Once the target set T exists, the '374 Patent directs the machine to "execute the classification process that enables training of a classifier using documents in the target set …." Ex. A, 18:33–34.

42.     The patent then specifies that the classification process "utilize[s] a second iterative search strategy which does not distinguish between documents in the target set and documents in the document collection to classify documents in the document collection." Ex. A, 18:35–39. Consistent with this language, the invention teaches a membership-agnostic classification step: the classifier applies a uniform decision rule across the collection, rather than using target-set membership as a factor in how documents are classified.

43.     While the specification does not limit the second strategy to any single implementation, it expressly contemplates that it may be "a TAR process" and, in particular, "a CAL approach which retrieves and/or classifies the most likely relevant documents from the collection." Ex. A, 7:26–29.

44.     Finally, the '374 Patent requires that the workflow "terminate the classification process based upon a comparison between the results of the second search strategy and a characteristic of the target set … wherein the classification process achieves a target level of recall with a certain probability upon termination." Ex. A, 18:40–45.



FIG. 1

# COUNT I
# INFRINGEMENT OF U.S. PATENT NO. 10,445,374

45. Adaptive restates and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

46. Adaptive is the owner by assignment of the '374 Patent. A true and correct copy of the '374 Patent is attached hereto as Exhibit A.

47. Upon information and belief, Arctera designs, makes, uses, sells, offers to sell, and/or imports into the United States the Arctera eDiscovery Platform (the "Accused Instrumentality"). References in this Complaint to the "Transparent Predictive Coding" workflow are public descriptions of the same functionality implemented in the Accused Instrumentality.

48. Upon information and belief, the Arctera eDiscovery Platform comprises a system for classifying documents and terminating the classification process when a tested score threshold is met. For example, the Platform is marketed as enhancing e-discovery, accelerating document review, and enabling users to finish by applying a predictive-coding cutoff. *See, e.g.*,

> **Overview**
>
> Release 7.1.2 of the Veritas eDiscovery Platform adds Transparent Predictive Coding to its technology-assisted review offerings. Transparent Predictive Coding helps organizations defensibly reduce the time and cost of document review. Transparent Predictive Coding enables legal teams to automatically classify documents according to case issues such as responsiveness or privilege, often requiring only a small fraction of the case to be reviewed manually. The net result is a more defensible automated document review process at significantly reduced cost.

> **What is Transparent Predictive Coding?**
>
> Over the last several decades there have been significant advances in the area of computing called machine learning. The goal of this research is to improve the ability of software to learn from inputs in the environment and use this information to make decisions. This machine learning technology can also be used to help make the review process more cost effective and accurate. For eDiscovery, this is commonly referred to as *predictive coding* (other terms are suggestive coding, computer-categorized document review and predictive categorization).
>
> Veritas's Transparent Predictive Coding technology provides visibility into the prediction process, enabling more informed decisions and facilitating greater review accuracy. This solution provides a workflow that adapts to the unique requirements of each case, allowing reviewers to begin using predictive coding immediately and achieve optimal results. Each step in the workflow is documented by comprehensive reporting to help demonstrate the integrity of review to the court.

> **Predict and Finish**
>
> The purpose of this step is to identify positive items to move out of Transparent Predictive Coding.
>
> **PREDICT & FINISH STEPS**
>
> **A. Use Predict to Predict on the Population**
> 1. Navigate to the Population folder
> 2. Open the Predict action
> 3. Select the Predictive Tag that is going through Transparent Predictive Coding
> 4. Select "All items in search results" to assign Prediction Ranks to all items in the Population
> 5. Finish and Predict on the entire Population
>
> **B. Use the Prediction Rank Threshold from the last Test to move positive items out of Transparent Predictive Coding**
> 1. From the last Test Report, get the Best Prediction Rank Threshold
> 2. Navigate to the Predictive Coding folder
> 3. Run an Advanced Search for all items at and above the Best Prediction Rank Threshold
> 4. Use either the Tag or Folder action to mark these items as predicted to be positive

https://www.veritas.com/support/en_US/doc/TPC_User_Guide_10.1

49. Upon information and belief, the Arctera eDiscovery Platform comprises at least one computing device having a processor and physical memory, the physical memory that stores instructions.

50. Upon information and belief, the Arctera eDiscovery Platform includes instructions that, when executed, cause the system to receive an identification of a target set of documents in a collection—namely, documents identified as relevant through an initial search-and-review process—and to store that identification in non-transitory memory. For example, the Platform's documented workflow directs users to locate documents using search features, manually review and tag those documents for responsiveness/issues, and then use those reviewer-applied tags in subsequent predictive-coding steps; the system records the tag selections as part of the case data. *See, e.g.*,

Case 3:25-cv-09640-RS   Document 1   Filed 11/07/25   Page 12 of 17

> **Detailed Workflow**
>
> The following sections describe the individual steps in this workflow. For details on each of the Transparent Predictive Coding actions, see *"Transparent Predictive Coding Actions" on page 25*.
>
> **Setup**
>
> The purpose of this section is to help you set up a set of folders for use in Transparent Predictive Coding.
>
> **SETUP STEPS**
>
> **A. Setup initial folder structure**
> 1. Create the Predictive Coding, Control Set, Initial Sample, Additional Sample, Population, Training Sets, and Training Set 1 folder (see *"Folder Setup" on page 15*)
> 2. Place all items to go through Transparent Predictive Coding into the Population folder
> 3. Select items for placement into the Training Set 1 folder
>    A. Navigate to the Population folder
>    B. Use the search features to locate between 100-1,000 items. See *"Training Set 1" on page 15* for more details.
>    C. Use the Folder action to Move these items to the Training Set 1 folder
>
> **B. Use Controlled Prediction Accuracy Test to create the Initial Sample for the Control Set**
> 1. Open the Controlled Prediction Accuracy Test action
> 2. Select the Tag to put through Transparent Predictive Coding
> 3. Under Step 1, specify the Population folder as the Population Source
> 4. Specify the Confidence level
> 5. Specify the Margin of Error
> 6. Specify the Initial Sample as the Destination Folder
> 7. Finish and generate the Initial Sample
>
> **C. Review the Initial Sample to calculate the yields**
> 1. Navigate to the Initial Sample folder
> 2. Review all items in the folder

https://www.veritas.com/support/en_US/doc/TPC_User_Guide_10.1

51. Upon information and belief, the Arctera eDiscovery Platform executes a classification process that enables training of a classifier using reviewer-identified target-set documents and then, through an iterative workflow, applies that classifier uniformly across the document collection to assign prediction scores and classify documents, without using target-set membership as a factor in the classification. *See, e.g.,*

COMPLAINT    12    CASE NO. 25-cv-09640

**Train and Test**

The purpose of this step is to achieve the highest quality Predictive Tag.

**TRAIN & TEST STEPS**

**A. Review all unreviewed items in Training Set**
1. Navigate to the Training Set 1 folder (where Training Set 1 is the current iteration)
2. Review all items in the folder

**B. Use Train action on all items in Training Set**
1. Open the Train action
2. Select the Predictive Tag that is going through Transparent Predictive Coding
3. Select "All items in search results" and ensure that "Include previously trained items" is checked to select all items in Training Sets for training

**C. Use Controlled Prediction Accuracy Test to Predict and Test on all items in Control Set**
1. Open the Controlled Prediction Accuracy Test action
2. Under Step 3, ensure that "The final sample has been reviewed." is checked
3. Finish and run the Controlled Prediction Accuracy Test
4. When the Controlled Prediction Accuracy Test job is complete, open the Test Report and evaluate the results

**D. If results are unsatisfactory, use Next Training Set to have the system select the next training items**
1. Navigate to the Population folder
2. Open the Next Training Set action
3. Select the Predictive Tag that is going through Transparent Predictive Coding
4. Select "All items in search results" to select from all items in the Population to be considered for the next training set
5. Specify a Move action to a new Training Set 2 folder
6. Finish and generate the Training Set 2 folder

**E. Repeat Steps B through E until results are satisfactory**

https://www.veritas.com/support/en_US/doc/TPC_User_Guide_10.1

52. Upon information and belief, the platform ends classification, *e.g.*, when a tested threshold from the Results By Outcome report meets the recall objective for the predictive tag, thus achieving a target level of recall with a certain probability upon termination. *See, e.g.,*

**Results By Outcome Section**

**Table 8: Results By Outcome**

| | |
|---|---|
| **Different Threshold Options:** | |
| Best Balance | Prediction rank threshold with the highest possible calculated F-Measure (or balance between precision and recall) |
| Fewer Misses | Prediction rank threshold with 10% higher recall than Best Balance (or a higher recall than the Best Balance, but at a loss of precision) |
| More Precise | Prediction rank threshold with 10% higher precision (lower recall) than Best Balance (or a higher precision than the Best Balance, but at a loss of recall) |
| **Results By Outcome** | |
| Threshold | Prediction rank threshold |
| Calculated F-Measure | Harmonic mean of calculated precision and recall. |
| Calculated F-Measure Range | Calculated F-Measure range percentage. |
| Calculated Precision | Percentage of all items above threshold that is positive |
| Calculated Precision Range | Calculated precision range |
| Calculated Recall | Percentage of all positives in sample above the threshold |
| Calculated Recall Range | Calculated recall range |
| Projected True Positives | Estimated number of items above the prediction rank threshold that would be tagged with the predictive tag. |
| Projected False Positives | Estimated number of items above the prediction rank threshold that would not be tagged with the predictive tag. |
| Projected False Negatives | Estimated number of items below the prediction rank threshold that would be tagged with the predictive tag. |
| Optimism Bias | Potential difference between expected results and actual outcome as a result of repeated iterations. For example, if the Calculated F-Measure was 80% with an Optimism Bias of 1%, then there is a statistical chance that the Calculated F-Measure would have been 79% if tested against a newly selected random sample.<br><br>**Note:** The optimism bias row is shown in the report only if its value is 10% more than the corresponding F-Measure range. |
| Projected Positives in Population | Estimated number of items in the population that would be tagged with the predictive tag |

> **Predict and Finish**
>
> The purpose of this step is to identify positive items to move out of Transparent Predictive Coding.
>
> ---
>
> **PREDICT & FINISH STEPS**
>
> **A. Use Predict to Predict on the Population**
> 1. Navigate to the Population folder
> 2. Open the Predict action
> 3. Select the Predictive Tag that is going through Transparent Predictive Coding
> 4. Select "All items in search results" to assign Prediction Ranks to all items in the Population
> 5. Finish and Predict on the entire Population
>
> **B. Use the Prediction Rank Threshold from the last Test to move positive items out of Transparent Predictive Coding**
> 1. From the last Test Report, get the Best Prediction Rank Threshold
> 2. Navigate to the Predictive Coding folder
> 3. Run an Advanced Search for all items at and above the Best Prediction Rank Threshold
> 4. Use either the Tag or Folder action to mark these items as predicted to be positive

https://www.veritas.com/support/en_US/doc/TPC_User_Guide_10.1

53. Upon information and belief, Arctera has directly infringed and continues to directly infringe the '374 Patent by, among other things, making, using, selling, offering to sell, and/or importing in the United States the Arctera eDiscovery Platform, during the term of the '374 Patent. See 35 U.S.C. § 271(a).

54. Upon information and belief, by making, using, testing, offering for sale, importing, and/or selling the Arctera eDiscovery Platform, Arctera has injured Adaptive and is liable to Adaptive for directly infringing one or more claims of the '374 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a). The Arctera eDiscovery Platform meets each and every limitation of at least claim 1 as alleged herein.

55. Upon information and belief, Arctera also indirectly infringes the '374 Patent by actively inducing infringement under 35 U.S.C. § 271(b).

56. Arctera has had knowledge of the '374 patent since at least October 8, 2025, when it received a letter identifying the '374 patent and notifying it of its infringement.

57. Upon information and belief, Arctera intended to cause and has caused infringement by third-party customers and users of the Arctera eDiscovery Platform and knew or was willfully blind to the fact that its inducing acts would cause infringement. Arctera specifically intended, and was aware, that the ordinary and customary use of the accused product would infringe the '374 Patent. Arctera performed acts that constitute inducement and would induce actual infringement with knowledge of the '374 Patent and that the induced acts would constitute infringement. For example, Arctera provides product documentation and training materials instructing customers and end users to: (i) create and tag training documents during Setup; (ii) run an iterative Train → Test → Next Training Set workflow to retrain and evaluate the model; and (iii) "Use the Prediction Rank Threshold from the last Test to move positive items out" in Predict & Finish, once performance targets are met at the specified confidence level and margin of error. By providing those instructions and training, Arctera specifically intended to and did encourage, instruct, and lead customers and end users to use the Arctera eDiscovery Platform in a manner that directly infringes one or more claims of the '374 Patent, including at least claim 1. *See, e.g.*, Transparent Predictive Coding User Guide 10.1.

58. After receiving Adaptive's October 8, 2025 notice letter, Arctera continued to host and circulate the documentation described above and to promote the accused features, demonstrating at least reckless disregard of Adaptive's patent rights.

59. Despite having notice of its infringement, Arctera has continued to make, use, test, offer for sale, import, and/or sell the Arctera eDiscovery Platform in a manner that infringes the '374 Patent. Arctera's conduct is willful, and Adaptive is therefore entitled to enhanced damages under 35 U.S.C. § 284.

60. As a result of Arctera's infringement of the '374 Patent, Adaptive has suffered monetary damages and seeks no less than a reasonable royalty for the use made of the invention by Arctera, together with pre- and post-judgment interest and costs as fixed by the Court. See 35 U.S.C. § 284.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Adaptive respectfully requests that this Court enter:

a) A judgment in favor of Adaptive that Arctera has infringed the '374 Patent, either literally or, in the alternative, under the doctrine of equivalents;

b) A judgment that Arctera's infringement of the '374 Patent is willful;

c) An award of damages resulting from Arctera's acts of infringement in accordance with 35 U.S.C. § 284;

d) A judgment that this case is exceptional under 35 U.S.C. § 285 and awarding Adaptive its reasonable attorneys' fees, costs, and expenses incurred in this action;

e) A judgment and order requiring Arctera to provide accountings and to pay supplemental damages, including, without limitation, pre-judgment and post-judgment interest; and

f) Any and all other relief to which Adaptive may show itself to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Adaptive requests a trial by jury of any issues so triable by right.

Dated: November 7, 2025          Respectfully Submitted,

/s/ *Bradford J. Black*
Bradford J. Black

Bradford J. Black (SBN 252031)
BRADFORD BLACK P.C.
1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 813-6211
Facsimile: (415) 813-6222
Email: bblack@bradfordblack.com

*Attorneys for Plaintiff*
ADAPTIVE CLASSIFICATION
TECHNOLOGIES LLC